Good morning. Our first case for today is 2022-30609 Louisiana Fair Housing Action Center v. Azalea Garden Properties, LLC. You may proceed, Mr. May it please the court. Alex Rothenberg on behalf of the appellant, Azalea Garden Properties, LLC. The district court's certified question asks whether HUD's predictably will cause standard for FHA disparate impact liability claims survive this court's Lincoln property decision. But before addressing that, I warrant dismissal before the court need reach that issue. Disparate impact liability under the FHA really has three steps. The plaintiff must identify an alleged offending policy, identify a disparate impact, and then the third step, which goes to the certified question, is establishing at the pleading stage or demonstrating a causal connection between the claimed of or complained of policy and the disparate impact. Could I ask a preliminary question, please? Are we at all limited to review those elements? I think you're about to tell us that something's deficient in the pleading. And I'm wondering on this certified question, we've been asked this particular question, is it clear that we can go beyond the question asked to address something that's a condition precedent for the proceeding for the case? Yes, Your Honor. This court's precedent and it's stated in our brief is very clear that it's the order that is certified and this court is not restrained by the district court's framing or certified question. But should we have certified the question if there's some other deficit? I mean, should you be getting the bite of the apple of an interlocutory appeal that you wouldn't ordinarily get? It seems that that's, is that appropriate procedurally? I believe so because these are threshold issues that also go to the ultimate question. Do you have a case that says we can do that, we can say, oh well, your standing is off, just for example or something, that we can go back and do that when we wouldn't ordinarily be able to do, we wouldn't have an interlocutory appeal on it at all at that stage? The cases we cite in our opening brief regarding the jurisdiction of this court on an interlocutory appeal, again open it up to anything that's fairly contained within the certified order. I don't, as I stand here now, have a specific case regarding going back or issues regarding standing, but I think that's jurisdictional for instance and always at issue. I would note specifically within the context of the FHA, and I'll get to this in a moment, the Supreme Court and quickly so that, you know, the limited nature of disparate impact claims and that entrepreneurs are not kind of hauled into court on kind of specious disparate impact. Right, but if we're not going to address this thing we certify for, because you want us to address something else, is the, should we say, oh we should not have certified, I mean we should have not, we should have declined because we realize now we're not actually going to even address that question. Is that what you're asking us to do? No, Your Honor, I'm providing what I see as other grounds by which the court could reverse the certified order and it's warranted here. The court certainly can address the disparate or the robust causation issue. I believe the motions panel was corrected in granting the interlocutory appeal, which I believe Judge Elrod and Judge Wilson were both on that motions panel. I believe that was correct and appropriate. Right. So you think we could we could explore standing, for example, because it's jurisdictional? Sure, I mean standing absolutely because it is. I mean the district court danced on ripeness a little bit in the order that's at issue, right? But not standing per se. That's correct. The ripeness issue, however, was with what I believe is an abandoned claim. There was a claim made of failure to, you know, to accommodate. And we raised the issue that there had been nothing in the complaint suggesting that an accommodation was requested. In Louisiana Fair Housing's opposition, they abandoned, and I believe in a footnote that we point out. But standing or any other jurisdictional issue is always before the court and always has jurisdiction to review its own or the district court's jurisdiction. We've taken up five minutes of your time talking about what you might argue. Sure. I'd be interested in hearing what you're going to argue. Thank you. Very briefly on those what I consider threshold issues. I think you want to talk about standing. I'm sorry? You want to talk about standing. I don't believe this is an issue of standing, Your Honor. I think it's a Twombly-Iqbal issue of just pleading sufficient facts to support a plausible claim to relief. The complaint is premised on an assertion that Azalea Garden imposes what they call a blanket ban, which is automatic rejection of any applicant who has any criminal history, felony or misdemeanor conviction regardless of time, or an arrest without conviction. The reasons for that theory are reliance on the statements of several rental agents that, even as relating the complaint, don't support that assertion. And even the statements, again, as stated in the complaint, contradict that in several ways. They say they don't know. There's no agent that even remotely states that an arrest without conviction would result in automatic denial of the complaint. And then when pressed further, the rental agents say we're not really sure how the policy is enacted because we don't control that issue. It's done by a third party. So the point I'm making is that it is inherently unreliable to base your assertion of a blanket ban or theory of a complaint of policy on the statements of rental agents who themselves, in the complaint, relate that they don't know exactly. Yeah, but they say repeatedly, well, a ten-year-old conviction, if it catches it, it's going to throw you out. Or a seven-year-old conviction. I mean, in other words, what is alleged in the complaint is clearly a variance with the written form that Azalea Gardens uses. And so isn't that enough? We've got to take the facts as alleged in the light most favorable to the plaintiff. Well, I don't think it's enough to assume a blanket ban. For instance, there's nothing, I think, that can be contrived leniently to suggest that an arrest without a conviction would result in automatic rejection. And I, the statements when read... But it seems to me that you're quibbling around the edges on their allegations and that's going to be hard to do in a motion to dismiss, is it not? I appreciate the standard and the point. And again, I'll move because I see these as threshold issues, which would get the court to get the certified issue and maybe resolve some of the qualms of the panel regarding the propriety of certification. Very briefly, the other issue that the complaint has before we get to the robust causation requirement is their failure to allege an actual disparate impact, which is, I believe, even more fatal. There are no allegations regarding acceptance or rejection rates, the applicant pool, housing opportunities in the related area. So without even alleging a disparate impact, I don't think they have a robust causation requirement. Are you saying they don't say that there is a disparate impact? Are you saying they don't put enough meat on the bones? Well, they certainly say in a conclusory fashion there is a disparate impact, but I think under this court's precedent in Lincoln Property and ICP, that certainly is not enough. And that really brings me to the court-certified question regarding if the HUD standard survived. Lincoln Property is fairly explicit that after the Supreme Court's decision in ICP, that decision required a, quote, more demanding standard. And the main issue with the HUD standard was that it had no robust causality requirement. This court reiterated and reaffirmed the fact that HUD standard is obsolete in the subsequent heartland. What would be enough? What would be enough in terms of allegations in your telling to hurdle the Rule 12 standard? For a disparate impact or, I'm sorry, for causation, I think you need a disparate impact to show that and then statistical evidence to show causation. So, for instance, if it's a newly enforced policy, you could have the graphics of the complex or the facility before the policy was enacted and after. You need all that in your complaint? I'm sorry? You need all that in your complaint? I think there are other ways, but yes. You're not saying you get that evidence in discovery because you have to get documents from the housing authority or whatever. You're saying you need it in your complaint. Yes, Your Honor. And I would compare this to Lincoln Property, which discussed vouchers. And in that case, the plaintiff came forward with demographic data regarding the complexes by race. They had data demonstrating that African Americans were more likely to hold vouchers than other ethnicities or they agreed that that was conclusory rather descriptive that the policy was actually the cause of any disparate impact. In this instance, you have far less than what was found insufficient in Lincoln Property. You don't have that kind of demographic data compared with census tract information. You just have an assumption that this policy will do all those things. Do you want to talk about what standards you would the certified question itself? Sure, Your Honor. With the certified question, I believe there's really no question after Lincoln Property that the predictably will cause standard of HUD is inoperative. What is the standard? The standard is what's announced in Lincoln Property and in ICP that you have to provide statistical data or allegations to show a robust causal connection between the complaint of policy and the disparate impact that you identify. And to do that, at a minimum, I think you have to show some disparate impact. It's hard to, I don't know how you can prove causation, cause and effect without articulating the effect. Right. Don't we, shouldn't we clarify what robust causality is though? I mean, are we going to be back in the same with the car certified question next week if you don't win on your other arguments because we don't know what robust causality means? Well, I do think Lincoln Property explains what that means. It is a connection between the disparity and the policy at issue. But it didn't really adopt anything from the other circuits. I mean, it sort of said under any of these tests, correct, plaintiff's loops. I mean, so I guess to Judge Elrod's point, if we take that approach here and your side prevails, we haven't really given any clarity. Do we need to do that? Do we need to say, well, here's what it means? I mean, how do we build on Lincoln Property? In this case, I don't believe the court does because the allegations of Crawford fall far below what was Crawford in Lincoln Property. So if that wasn't good enough in Lincoln Property, I think as a matter of circuit precedent, it can't be enough here. Going forward or building upon Lincoln Property, I think there has to be some appreciation of isolating potential variables. I'm not saying they have to allege data or information beyond a shadow of a doubt or so statistically significant to rule out anything else. But an allegation that plausibly removes other variables for creating a disparity complaint of because the ICP court was very clear in Lincoln Property that a disparity alone does not state a prima facie case for disparate impact. You have to show that causal connection. So if this complaint here is sufficient to allege robust causation, I don't know what complaint wouldn't satisfy that standard. If that's the causal connection that has to be shown. Do you believe that you must show that a protected class be actually disproportionately affected by the policy and that the practice causing the disparate impact is not justified as the Fourth Circuit says? Yes, the justification is a step in the burden shifting framework. So are you asking us to adopt, I mean you're saying we don't need to, but if we have to pick a test, what test should we pick? And I'm going to give each side two minutes since we had preliminary discussions at the beginning about whether we had jurisdiction. I think the test needs to, as I said earlier, plead enough that it shows a disparate impact and the causation by eliminating the likelihood of other variables being the cause of any disparate impact that can be shown. And you're talking about a disparate impact at the property, not, well, the disparate impact on the number of incarcerated individuals, you know, more macro. Well certainly, I mean at base the disparate impact has to be one that's caused by the complaint of policy. No one argues that disproportional criminal justice outcomes are a result of the policy. Just like vouchers in Lincoln property weren't, you know, the increased likelihood of African Americans owning the vouchers wasn't as a result of the policy. In this case, the plaintiff has been a little all over the place with what the disparate impact is they suggest. So I don't know what they will articulate. They've said it's exclusion from the complex, the specific one, and also exclusion or reducing housing outcomes in Jefferson Parish. I don't believe there are allegations to support, even on a speculative or conclusory level, that either of those two disparate impacts have occurred here, which again I think present problems for their complaint. I have very little time. Just briefly, I wanted to address the fact that I don't believe any of these deficiencies can be resolved via amendment to the pleadings. Louisiana Fair Housing has stated in the district court what they have and what they can allege, and I don't believe anything they've proffered would get them past what has to be done for a burden. Thank you. Thank you. Let's save time for rebuttal. Ms. Watson. Good morning. May it please the court, Sarah Carthen Watson, Legal Director of the Louisiana Fair Housing Action Center, on behalf of the Plaintiff Appellee. The appellant has tried really extensively to expand the scope of this argument beyond what is truly a simple question. What is the correct pleading standard for a disparate impact claim in this circuit, and whether LAFAC has pled adequate facts to meet that standard? First and foremost, Judge Zaney's order on appellant's motion to dismiss appropriately applied whatever standard was laid out in Lincoln Property. The appellant claims that Lincoln Property has constituted a full and outright rejection of the HUD standard, and the text of the opinion simply does not support that position. While the court in Lincoln Property did find that the Supreme Court didn't affect the wholesale adoption of the HUD regulation, and did impose a more demanding pleading standard, the text of Lincoln Properties is clear that the Supreme Court made a modification to the HUD test, not an elimination of the HUD test. Ms. Watson, you said in your first sentence that what is the correct pleading standard, and whether your clients meet that, some paraphrase of that. Are we allowed to consider whether your clients meet that under Twombly and Iqbal, once we articulate? So, if we believe that on this certified question, if we believe that it's not met, we can dismiss on that ground and not just answer the question of what is required? Yes. Okay. What about standing? How does the plaintiff have standing to bring this action? So, as an organization that seeks to eliminate housing disparities and combat housing discrimination throughout the state of Louisiana, we have organizational standing. I mean, what is the injury? As I look at paragraph 68 through 73, that part of your complaint where you allege injury, it sounds square up with paragraph 12 where you allege what the mission of the organization is. How has the organization been injured? Right. So, we routinely bring suits as an organizational plaintiff, and we always demonstrate injury through the diversion of resources. But what resources are diverted from what you normally do? So, we receive a lot of grant funding, and as a result of that grant funding, we have certain program activities required to carry out through that grant period. And so, when we are notified of a discriminatory housing practice, we abandon those practices temporarily to take actions to counteract the housing discrimination. Your grant funding can be applied to litigation or to further investigation? No. We have a separate funding for litigation. All right. But so, again, if your mission is to investigate housing discrimination, that's what you're doing here. How is this a sufficient allegation of organizational injury for standing? Well, the Supreme Court has routinely upheld organizational standing for organizations like ours, and we have specific evidence. Where they show an injury, like a diversion of resources. Right, and we show a diversion of resources. We have staff that are trained in how to establish specific diversion in terms of staff hours and costs. So, for example, we identify discriminatory housing practice in one area, we might send out mailers to community members. We may go do trainings at the local library, the local school for families to understand what their rights are specific to that discriminatory housing practice. So, how is that different than what you normally do day-to-day then? Well, that's the point. So, we have our grant activities that we normally do, and they're very specific. So, the grant, the program activities might state that we're going to run an ad campaign on familial status. But if we identify discriminatory housing practice on the basis of disability in Jefferson Parish or a specific area of Jefferson Parish, we might send out mailers or do specific targeted outreach and and we document all of that. So, is the diversion of resources litigation? No, the diversion of resources is separate from litigation. But when we get to the litigation stage, that is how we show our organizational injury because our top staff time. So, what is, if it's not litigation, I understand that. I think we sort of pooh-poohed that theory in the Acorn case. So, what is the resources that are being diverted here? Is it having to audit? Staff time and financial resources specifically. Do you all, I'm assuming given the mission of the organization to combat racial discrimination in housing, you look at a number of housing facilities? Yes. Right. And I take it you audit a lot of the facilities that you don't end up pursuing? Yes. So, what did you do here that goes beyond that sort of auditing activity? So, if we audit a housing provider and we don't encounter any discriminatory housing practice, there's no counteraction of that housing practice that needs to take place. So, if we identify a property that has committed discrimination, then we notify our education outreach staff and they take appropriate counteraction. But this seems circular to me because basically what you're saying is you'd have standing in every case where you find something. I don't think so, your honor. I mean, when would you not? Well, we don't sue every housing provider necessarily that we identify as a discriminatory housing practice. So, put the litigation aside though. Would you not have standing to do so under your theory? I mean, it just seems like, as you said, you've got people who document diversion of resources and all that sort of thing. It kind of strikes me as a cottage industry. We can, we investigate. We find something. We decide we want to pursue it in greater detail. Ergo, we have standing. Well, we do that. We take those steps regardless of whether a lawsuit eventually results or not. But we're talking about standing, whether you file or not. We're talking about an injury to the organization. Is your position that the organization is injured every time you uncover one of these alleged practices and pursue it further? Well, we're not injured by the uncovering itself. We're injured as a result of the actions that we take to counteract the discrimination that is occurring. So, it's the educational things that you do afterwards? Yes. So, once you've identified it, then you put the staff that sends out flyers or emails or whatever and says, oh, this is a problem in this house. Yes. Okay. Okay. This is a purely practical question. I assume it would not be difficult to find a plaintiff who actually wanted housing and was denied housing due to having a criminal background. Oh, we get calls every week from people who are denied housing. But you don't have one of those. You're the only plaintiff, right? Why not join one of those plaintiffs? That would solve the standing problem for us. Well, this investigation came out of an audit. So, we were not doing complaint-based investigation. We routinely conduct audits of the housing market across the state on various basis. So, we were doing a criminal background screening audit and we conducted investigation of several properties to inquire as to what their criminal background screening policy was. I think you agree it would not be difficult to find such an individual. I mean, you're out there to combat racial discrimination. There are real victims. That's true. We do hear from several people often who are denied as a result of a criminal background, but litigation is a lot of work for a plaintiff and things like that. So, I wouldn't say it's easy to find somebody who's willing to go through federal litigation. It may not be easy to convince them. I get that. I believe me. I get that being a plaintiff is not fun. There are plenty of people who are being denied housing. I guess where I'm going is, hypothetically, if we were to find that there was no standing, presumably, you could refile and find such a plaintiff. That was specifically denied at Azalea Gardens? Right. That may be difficult, but... Why would it be difficult? Well, I think... If, in fact, there is a discriminatory pattern, as obviously you believe there is, why would it be difficult to find an actual victim? I think logistically, we just have to figure out the best investigative tool. I'm not saying you can wave a magic wand, but I think through some work you could find one. So, what is the standard we should apply? So, the standard that we should apply is whether or not, at this stage, we have pled adequate facts to show a plausible and robust causation between the defendant's policy and a disparate impact. What is entailed for robust causation? The Fourth Circuit and the Eighth Circuit seem to differ, for example. What should we say is robust causation? So, from Lincoln Properties, I think the standard here is that robust causality means a plaintiff must identify both a policy that's attributable to the defendant and the requisite causal connection between the policy and the racial disparity being alleged. And LAFAC has met both of those problems. What racial disparity is being alleged at Azalea Gardens? We are alleging that there is a clear racial disparity in who is permitted to or who is excluded from renting at Azalea Gardens. But what is in the complaint besides the legal conclusion, the alleged disparate impact? Statistical evidence from experts Wildman and Parnell that show that Those relate to the property? African-American. They are tailored. They're not national statistics. They're not general national statistics. They conducted a demographic analysis of where Azalea Gardens is located. Jefferson Parish. Right. But, I mean, what about the property? Don't you have to show that the policy caused the disparity? Well, the correct inquiry is not whether or not what the demographics of the current property, of the property currently are. And one, that's not information that would be readily available for us to ascertain at this stage. So I think Azalea Gardens is kind of jumping. It was there in Lincoln Property. But, I'm sorry. It was there in Lincoln Property, was it not? Yes. And that got, they got dismissed for failure to meet the robust causality standard. How does the complaint allege that the alleged blanket ban caused the disparity? So the disparity in question is not the disparity. We're not alleging that Azalea Gardens caused the disparity in the criminal justice system. But don't you have to? No. Because, you know, as several courts have pointed out, that would be holding them liable for a disparity they did not create. We're not trying to hold them liable for a naked racial disparity. What we're holding them liable is for the disparity they choose to create by employing a blanket ban that creates the maximum amount of exclusion. What in the complaint alleges that this is created or likely will be created? The statistics that we show show that African Americans in Jefferson Parish are twice as likely to be renters and also six times more likely to be incarcerated and therefore have a criminal record. So any policy that has a complete blanket ban on anybody with a criminal record is going to exclude African Americans at a higher rate. And I think to just make this super clear, this is not a situation where every housing provider is going to be sued. I think Azalea Gardens is trying to play into that hysteria. Nearly every housing provider across this country employs some method of criminal background screening, and the vast majority of them are not hauled into court for violations of the Fair Housing Act. It's very clear that they employ a blanket ban, the maximum amount of exclusion, that's not tailored to any legitimate interest and not supported by the HUD guidance on this issue as well. So they are choosing to create the maximum amount of exclusion at a disparate rate. African Americans are the group, the dominant group that are most affected by that policy. Why aren't those other policies also discriminatory? Because they're more tailored to an interest. So for example, their interest is most likely, we haven't gotten to that stage of the burden shifting framework, their interest is likely to protect the health and safety of their residents, right? So if you have a criminal background screening policy that says maybe recent violent crimes or recent severe property damage crimes, that may be more reasonably tailored to the interest of protecting health and safety. But a blanket ban on anybody with a criminal record is unnecessarily excluding people, and the HUD guidance is clear that a blanket ban, it cannot meet the burden of showing that something is tailored to a legitimate interest. So your point is those policies, is your point that, let me just ask it this way, is your point that those other policies that you would not presumably challenge, is your point that they're not discriminatory in terms of the numbers, or that they may be discriminatory, but it's okay because they actually achieve valid interest? I would say, I wouldn't phrase it either of those ways. I would say that they are more narrowly tailored to a substantial and legitimate business interest. And then that third step of the burden... But would it be fair, what if I were to tell you that I could imagine many of them would still be, in fact, discriminatory? Yes, and even Judge Zaney points that out in his order, even because they do a lot of saying that we don't show that they have a blanket ban, which the testing does not support, but he even points out that something short of a blanket ban could conceivably violate the Fair Housing Act as well, if it's overly restrictive. But it's really their burden. They're trying to shift the burden from What I'm trying to figure out is, what are the policies that you believe are not violative, and what do they look like? Because I think what you're saying, but I don't want words in your mouth, so I'm asking, are the policies that would not be violative in other cases, would they be discriminatory, just valid, because they have these justifications that you're okay with? Or are you saying it's only when there's no discrimination? Well, that's why we have the burden shifting framework. So we would identify a policy that we find to be discriminatory. The defendant would have the opportunity to show that that's tailored to a legitimate business interest, and then we would have the opportunity to show that there are less restrictive or less discriminatory methods of achieving that same interest. So it would depend on the policy itself. But I think just in the last 10 seconds that I have, this is not a case that is going to open up the floodgates to unnecessary litigation. I think our case alone shows that Lincoln Property is a test that kind of cabins things off. Our disability claim, for example, did not make it application of Lincoln Properties, but the race claim did because we were able to identify a specific policy as well as point to statistics that support it. Is there a criminal background check policy that you're prepared to tell us would be okay? Am I allowed to proceed? Yes. Yes, we allege that Amelia Yardens employs a blanket ban. I mean, we have one of them. That would be okay. I understand your theory here. You're basically saying that the other side is wrong in making the floodgates argument, and so I'm giving you the chance to convincingly rebut that argument. One way to do that is to give us a safe harbor. Tell us the kind of policy that you would be fine with, either because it doesn't produce discriminatory numbers or because it does produce discriminatory numbers. But despite that, you're convinced that it achieves important interests for the facility. The type of policy we'd advocate for is individualized review. So if someone were to apply for residency at Azalea Gardens and they had a criminal record, they would provide that information and would be able to supplement that information with evidence of rehabilitation, evidence about the nature and circumstances of that conviction, how long it's been since that conviction took place, so that there can actually be a true assessment of whether that person poses a risk and is not being excluded unnecessarily just based on that. Isn't that a bit unusual, though, or maybe unusual is the wrong word, but the notion that a facility you believe is just engaging in discrimination, what you want to do is give them more power and more discretion. It's not necessarily discretion, but it's more information. But it's individualized. Right, it's individualized in the sense that a person is not tarred with a brush automatically because they have a conviction. It's individualized in that they are looked at as an individual human who may have committed an offense when they were 18 and now they're 45 and can't find housing anywhere because a housing provider like Azalea Gardens blanketly excludes anybody with a criminal conviction. So it allows them to provide additional evidence for them to actually be considered as an individual applicant and not just blanketly excluded from housing. Thank you, Ms. Bortnick. I see the remainder of my time to the Department of Justice. Thank you. Ms. Bortnick. May it please the Court, Yael Bortnick for the United States. And this morning I'd like to focus on two issues. At first, whether the predictably low cost standard survives this Court's Lincoln property decision. And second, whether to state a prima facie case, the plaintiff needs to plead specifics about the racial composition about the defendant property itself. I'd like to begin with the predictably low cost standard, which is based on the text of the FHA itself, which prohibits discrimination that is about to occur. It defines an aggrieved person as someone who believes they will be injured by a discriminatory housing practice that is about to occur and authorizes enforcement actions and relief in situations where discrimination is about to occur. The predictably low cost standard was recognized by courts long before it had issued the 2013 rule. And nothing in the Lincoln property decision forecloses plaintiffs from continuing to be able to rely on that standard in bringing claims. Turning to the property specifics, at the motion to dismiss stage, the plaintiff was not required to allege specific data about the property itself. A court in examining a motion to dismiss is allowed to draw on their judicial experience and common sense, and here the allegations that are in the complaint demonstrate that when you are incorporating a factor that has a known racial disparity, such as incarceration rates, into your policy, that it's common sense that using that factor is going to exclude more African American potential applicants than it will exclude white applicants from the complex at issue. What authority would you say that we should use to say that, well, it's good enough under common sense? Well, under, there's a number of cases in Dothard in the Supreme Court recognized that there's no requirement that statistical showing of disproportionate impact must always be based on the analysis of the characteristics of actual applicants. Uh, Ward's Cove, in which the Supreme Court cited for the robust causality requirement in inclusive communities, also recognized that the specific causation requirement it was adopting wouldn't be underly burdensome on plaintiffs because they generally have the benefit of discovery to meet their burden of showing a causal link. This court also in Inova Hospitals recognized that where the evidence is within, um, solely within the defendant's control and possession, you may not require a plaintiff to plead that evidence in their complaint to get past the motion to dismiss stage. Well, but it just doesn't seem that common sense is really compatible with robust causality. I mean, I don't know how we square this with Lincoln Property, where they alleged things about each of the properties, and that still wasn't enough because they didn't show the causal connection. I mean, do we leave the key element of causal connection to common sense, even at the pleading stage? I don't think we leave it to, leave it to common sense. A plaintiff has to allege under inclusive communities sufficient facts or statistical evidence to draw the reasonable inference, weighing all facts in light of the plaintiff, that the policy at issue is causing the disparity. What does this complaint allege that, that, that the policy at issue, the alleged blanket  The causation theory here is straightforward. The criminal screening policy was crafted in a way to incorporate an existing and known racial disparity that naturally is going to create a similar racial disparity in who's being excluded from the policy. If you apply to, uh, Zalia Gardens as a potential tenant, you're put through a criminal screening, and if you have something show up, regardless of the severity, the recency, or the accuracy of what shows up on your criminal record, you will be excluded. And based off the substantial disparities in incarceration rates at the national, state, and local level, it reasonably follows that that policy will exclude more African American applicants than it will exclude white applicants. How is that not holding Zalia Garden responsible for a disparity it didn't cause? Well, they are the ones who are implementing their policy of excluding everybody with a severity of what shows up on the criminal background screening. So it's not holding them responsible for incarceration rates. It's holding them responsible for using a policy that will reasonably operate in a way that's going to exclude more African Americans. Pardon my ignorance, but you're obviously here for the United States. What is the federal government's policy with respect to federal employment and criminal background checks? Well, in the Title VII context as well, I believe the EEOC has also released guidance saying that similar criminal background checks could raise Title VII issues in Carson versus Lacey. Does the United States government conduct criminal background checks for certain employment positions? I believe so, but I'm not prepared to speak to exactly how that works for the United States. What about using criminal background checks before gun ownership? I don't think that what the United States is asking at all implies that there may not be a proper way to use a criminal background check in a variety of circumstances. But here with the burden-shifting framework, on the first front, what Zalia Gardens has shown is sufficient to get the prima facie stage of the motion to dismiss. In the second and third front, there can be a discussion of whether a policy is justified. But here the question is just whether there is sufficient facts to show that it is disproportionately going to affect- So the position of the United States government then is if a federal employer were to employ the type of criminal background, the broadband that we're talking about in this case, that's with respect to a gun regulation. That would be discriminatory? I think that the question in this case is whether it causes a disproportionate effect on a protected class. But we're talking about the same policy. So presumably it's the same database. It doesn't matter whether you're using the results of the database to deny somebody housing, deny somebody a gun, or deny somebody a federal job. It's the same numbers. Well, the question on the first front is just whether it causes a disproportionate effect on a protected class, whether or not that's intentional. But you'd agree it would have nothing to do with what you're using it for. Let's say I do the criminal check. I'm not even telling you why I'm doing it. It's the same numbers, isn't it? A policy, yes, many policies may have a disproportionate effect on a particular class. I wouldn't dispute that. Here within the Fair Housing Act, it's clear that that may be sufficient to get you past the first front. Where a policy is likely to be justified, the Supreme Court in recognizing disparate impact. You see why I'm asking. It just seems odd to say it's discriminatory with respect to housing, but not with respect to federal jobs or guns. Well, there's a three-part burden-shifting framework. And we're just talking about, as in the first round, whether there is this disproportionate effect, not whether a policy is justified. That would be answered at the later prongs. I think I've limited time, and I want to speak quickly about how this case is different from multiple key ways in which this case is different. First, that case didn't raise a predictably well-caused claim. There weren't sufficient allegations in that complaint to show an actual causation. It wasn't a discussion of predictably well-caused. I think the very other important way that it's different is that it was a vouching program. And the Court's discussion seemed to hinge on the fact that Congress has recognized that that is a voluntary program because it places substantial burdens on landlords. Here, there's a large difference because in the 1988 Fair Housing Act amendments, Congress explicitly recognized, as the Supreme Court noted in ICP, that by enacting an exclusion for certain criminal convictions, Congress was recognizing the existence of disparate impact liability. So in the 1988 amendments, there's an exemption where you wouldn't be found liable if you're excluding someone because they have certain types of direct convictions related to distribution of drugs, and I think there's one other. And that implicitly shows that other types of direct convictions, which the Supreme Court recognized can be correlated with race or sex-protected characteristics, may still have liability lie for landlords with respect to disparate impact liability. Also, at footnote 11 of Lincoln Property, there's a recognition that it might be a heightened pleading standard or a higher standard if you're challenging affirmative action, such as a voucher policy, versus eliminating an obstacle to housing such as here. We respectfully ask that this Court affirm the District Court's decision. Thank you. We have your argument. I proceed with your rebuttal, Mr. Robin. Thank you, Your Honor. I want to circle back, Judge Elrod, to your question about the scope of this Court's review on the certified question you asked for cases. I just want to go back to our brief. In Castellanos Contreras v. Decatur Hotels, which was an en banc decision, this Court said, quote, under 1292B, it is the order, not the question, that is appealable. And then in another en banc case, Consumer Financial Protection Bureau v. All-American Cashing, Inc., this Court said, quote, we routinely consider, or this Court routinely considers questions other than those certified by the District Court. So I think the Court certainly has authority. I would also add that in this instance, the threshold issues, as I've identified them, are really intertwined with the certified question because it considers the ability of the plaintiff to allege a disparate impact and a causal connection. So I don't think it's really the Court going far beyond the certified question in any way. I also wanted to address something that dovetails comments that Judge Ho or questions he was asking, and I think one of the main issues with the construction of the Fair Housing Act and disparate impact claims raised by counsel opposite is there's really no limiting principle, especially in an instance here where they are not naming or identifying a policy. It's purely a speculative one they believe to happen. And if that's enough, then any... Well, it's not speculation that a blanket ban would have these statistical discriminatory ramifications. That's not speculative. I think it is speculative, Your Honor, respectfully. How is that... The numbers are the numbers. Sorry. Oh, I'm sorry. I was following up. The numbers are the numbers. But whether it will create an actual disparate impact, I'm not saying that it certainly... Whether you can justify it or not, I know it's debatable, but the numbers are the numbers, I think. The numbers with regard to... The racial implications for these policies, for any policy. Yes, the numbers are the numbers, I think, but I don't... It does create a disparate impact just because of the statistics that we all know and that are in the complaint. Well, I think... So the question is whether there's a legitimate basis for it that would justify it, you know, the burden shifting. Yes, Your Honor. So we keep... I mean, you can't fight disparate impact in this court here today. You have to take the law as given. Yes, Your Honor. So I don't... So where do you go? If we know that it does create a disparate impact and they've alleged that this causes the harm because it's not tailored at all and could be tailored, then why doesn't that state a claim? Your Honor, I would not necessarily state that there is or would be a disparate impact, and I don't think the district court, even though it applied the wrong standard, thought that, and it specifically said, quote, what is missing in this case is an allegation regarding an actual racial disparity connected to that policy. The racial disparity that this case depends upon at the pleading stage is theoretical and completely speculative. The racial disparity, are they saying because of the applicants to the project, to the housing unit placed? That's not that... Yeah, I think they're unclear on that point. They, in some instances, claim that it will result in higher rejection of individuals from Azalea Garden, the complex, and then they elsewhere claim broadly that it will reduce housing opportunities for African Americans in Jefferson Parish. But all things being equal, policy based on incarceration rates solely, you know, that it has no, it doesn't depend upon timing or any of these other factors or types of crimes, just statistically, it will have an impact, will impact certain communities more than others. Just because of the numbers of criminal convictions and by demographic data in America and in that county and in that neighborhood. Yes, and I'll say again, I could, you know, we dispute whether they were alleged enough to make a plausible claim that a blanket ban exists. But I think a robust, or a disparate impact is what they have to actually allege. I don't believe they can simply assume that. What is it that they're assuming that they're not allowed to assume? That's the part I have to disconnect with. Two things. That there is in fact a disparate impact on racial imbalance at the facility. They have not alleged that nor stated that that's necessarily the case. And they're also assuming. So they don't have the demographic data of the specific facility of people who applied versus people who were accepted. Is that, that's that until they have that, they can't name their claim. Is that what you're saying? I think that's one way they could. I'm not saying that that's the only way. Okay. So is that the only thing that you believe? Well, they're also speculating that any alleged disparate impact would necessarily be caused by the policy and not some other cause, which is also their burden to establish a prima facie case. Okay. But you're not just rejecting the idea that a policy such as this does disparately impact certain demographic groups just on its face. Whether it doesn't this particular complex or not, it just does on the whole. Yes, Your Honor. And I appreciate that you might disagree. I don't think it necessarily follows that it absolutely would. It doesn't mean that it's illegal. That's a different question. And I appreciate Jim's questions that, you know, you can have a disparate impact that's justified in other areas. I don't believe the complaint can just assume the existence of a disparate impact. I believe that is their pleading burden. And once again... What about their professor people? If you don't know it, why aren't the professor people good enough? If we can't just common sense know it, why aren't the professors who state these things good enough for pleadings? You can depose them and say that they did their research wrong, but why isn't it enough for pleadings? Well, the data supplied here in the complaint just talks about criminal justice outcomes. It doesn't speak to the area or, you know, that this will reduce rates. I'm sorry, housing opportunities and rates. That is what they're assuming. And I think that just really eliminates any kind of robust causality requirement and makes it indistinguishable from, you know, just a plausible or possibly may cause standard, which this court's rejected in Lincoln Property the following ICP. I know I'm out of time. I would just state briefly, for those reasons, I believe the court should refer to the certified order from the district court with regard to the disparate impact race claim. Thank you. Thank you. We have your arguments. We appreciate all the arguments in this case. And this case is submitted.